## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **BARRY BATSON; DAVID DOUTHAT; WILLIAM LANGER GOKEY; WILLIAM LANGEY AND SUSAN FLICKINGER GOKEY FOUNDATION, INC.; QUENTIN KRAMER; CHARLES MORTIMER; MICHAEL SOLKOW; JAMES WILSON, TRUSTEE FOR THE JAMES D. WILSON TRUST; AND WORTHINGTON ENTERPRISES, INC.,** | § § § § § § § § § § | |
| *Plaintiffs,* | § § | **Civil Action No. 1:15-cv-00379-RP** |
| **v.** | § § | **JURY** |
| **RIM SAN ANTONIO ACQUISITION, LLC; RIM INVESTMENT GROUP LLC; BIGHORN CAPITAL, INC.; ROBERT ENTLER; SCOTT MORGAN; AND SICHENZIA ROSS FRIEDMAN FERENCE LLP,** | § § § § § § § § | |
| *Defendants.* | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs, Barry Batson, David Douthat, William Langer Gokey, William Langer and Susan Flickinger Gokey Foundation, Inc., Quentin Kramer; Charles Mortimer, Michael Solkow, James Wilson, as Trustee for the James D. Wilson Trust, and Worthington Enterprises, Inc. (collectively "Plaintiffs"), complain of Defendants, RIM San Antonio Acquisition, LLC, RIM Investment Group LLC, Bighorn Capital, Inc., Robert Entler, Scott Morgan, and Sichenzia Ross Friedman Ference LLP (collectively "Defendants"), and would respectfully show the Court as follows:

## THE PARTIES

1.      Plaintiff Barry Batson is an individual who resides in Waxhaw, North Carolina.

2.      Plaintiff David Douthat is an individual who resides in Catonsville, Maryland.

3.      Plaintiff William Langer Gokey is an individual who resides in Minot, North Dakota.

4.      Plaintiff William Langer and Susan Flickinger Gokey Foundation, Inc. is a nonprofit foundation organized under the laws of North Dakota with its principal place of business in Minot, North Dakota.

5.      Plaintiff Quentin Kramer is an individual who resides in Wichita Falls, Texas.

6.      Plaintiff Charles Mortimer is an individual who resides in Tarentum, Pennsylvania.

7.      Plaintiff Michael Solkow is an individual who resides in Fort Lauderdale, Florida.

8.      Plaintiff James Wilson is an individual who resides in Austin, Texas. Mr. Wilson is Trustee for the James D. Wilson Trust.

9.      Plaintiff Worthington Enterprises, Inc. is an corporation organized under the laws of the state of Illinois with its principal place of business in Kane County, Illinois.

10.      Defendant RIM San Antonio Acquisition, LLC ("RIM") is a Delaware Limited Liability Corporation with its principal place of business at 250 Pilot Road, Suite 160, Las Vegas, Nevada 80119. RIM has been served with process.

11.      Defendant RIM Investment Group LLC ("RIM Investment Group") is a Delaware Limited Liability Corporation with its principal place of business at 250 Pilot Road, Suite 160, Las Vegas, Nevada 80119. RIM Investment Group has been served with process.

12.     Defendant Bighorn Capital, Inc. ("Bighorn") is a Nevada Corporation with its principal place of business at 250 Pilot Road, Suite 160, Las Vegas, Nevada 80119. Bighorn has been served with process.

13.     Defendant Robert R. Entler ("Entler") is an individual who resides in Nevada, and serves as President and Director of Bighorn. Entler has been served with process.

14.     Defendant Scott Morgan ("Morgan") is an individual who resides in Illinois and has been served with process.

15.     Defendant Sichenzia Ross Friedman Ference LLP ("SRFF") is a New York Limited Liability Partnership with its central office located at 61 Broadway, 32nd Floor, New York, New York 10006. SRFF has been served with process.

## JURISDICTION AND VENUE

16.     This action arises under Sections 10(b), 18, and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This action arises under the laws of the United States and involves federal questions. This Court further has jurisdiction of the related state law claims which arise from the same operative facts. This Court has personal jurisdiction over the Defendants to this action because each of them performed acts that constitute doing business in Texas by, among other conduct, contracting with a Texas resident and either party was to perform the contract in whole or in part in Texas, and committing a tort in whole or part in Texas. Thus, Defendants are subject to Texas long-arm jurisdiction under § 17.042, TEX. CIV. PRAC. & REM. CODE.

17.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the Western District of Texas, and the real property that is the subject of this action is located within the Western District of Texas.

## BACKGROUND

### A.     *The RIM San Antonio Acquisition LLC Offering Memorandum*

18.     In April 2013, RIM issued an Offering Memorandum outlining the private offer and sale of promissory notes in connection with a proposed real estate transaction based in San Antonio, Texas.   Upon information and belief, the Offering Memorandum and the representations made therein were made by or at the behest of Bighorn, Entler, Morgan, and RIM Investment Group.  Morgan was a managing member of RIM and thus had an active role in, or at the least, responsibility for, creating the terms, provisions, and representations in the Offering Memorandum.  Bighorn, of which Entler is the sole member, was the financier identified in the Offering Memorandum and was integral in setting the deal terms and details presented in the document.

19.     The Offering Memorandum that RIM prepared and circulated to prospective investors described a real estate development transaction featuring a joint venture that would purchase a 5.1-acre tract in northwest San Antonio (the "Property") and construct a 280-unit apartment complex on the site.

20.     The Offering Memorandum described the project as follows:

**The RIM is a planned 280-unit Class "A" urban apartment community located on Talavera Blvd at the development called the Rim in northwest San Antonio, Texas. The developer plans four and five story mid-rise apartment buildings with units wrapping the parking garage, making parking direct access to the units. The unit sizes will range from 600-1,375 square feet with one, two, and three bedroom units available. The development's amenities include a fitness center, a theater room, a business center, an entertainment lounge, and a resort-style pool.**

21.     The joint venture was described as a development arrangement between RIM, Bill Gunn  ("Gunn") (a central-Texas real estate developer based out of Austin), and Bryan Dorsey (described in the Offering Memorandum as having 25 years of "experience in all facets of real estate acquisition, financing and development").   Prior to the Offering Memorandum being distributed to potential investors, Gunn paid $500,000 toward the purchase of the Property by depositing the amount into an escrow account maintained by Heritage Title Company of Austin, Inc. ("Heritage Title").

22.     Bighorn     was     identified     in     the     Offering     Memorandum     as     the "Financier/Facilitator" who, along with Entler, would facilitate the development of the Property and   provide   related   financing.   Morgan   was   identified   in   the   Offering   Memorandum   as   a "Managing   Member"   of   RIM,   and   someone   with   an   extensive   real   estate   development investment experience.

**B.      The Note Terms**

23.     Under the Offering Memorandum, 10% Promissory Notes (the "Notes") maturing in 180 days would be sold to qualified investors. The Notes would only issue upon the purchase of at least $1,500,000 in Notes, which was described as the "Minimum Offering." The maximum offering was set at $8,500,000.   Critically, only money invested for the purpose of purchasing Notes   would   be   calculated   towards   the   minimum   $1,500,000   threshold.   The   $500,000 previously deposited by Gunn with Heritage Title was not to be applied to the Note purchase and did not count towards the Minimum Offering threshold.

24.     Under the Offering Memorandum, once the $1,500,000 threshold was met, the Notes   would   issue   and   RIM   would   pledge   the   Property   and   all   other   assets   as   security   for repayment of the Notes.

25.     The Notes would mature 180 days after issuance, at which time full repayment was due. If the Notes were repaid within 90 days of issuance, interest would accrue at ten percent (10%) per annum. If the Notes were not repaid in 90 days, the interest rate would increase to twelve and one-half percent (12.5%) per annum.

26.     The Offering Memorandum also contained a "Use of Proceeds" section that explicitly stated that the funds raised would be used for the purchase, development, and construction of the Property and marketing and payment of the offering expenses.

27.     As part of the Offering Memorandum, RIM included an Escrow Agreement that outlined the terms and conditions of SRFF's role as escrow agent for the offering. Under the Escrow Agreement, SRFF would act as the escrow agent for all funds received for the purchase of Notes, and SRFF would further release and transmit such funds in accordance with the Offering Memorandum upon, among other things, receipt of funds of at least $1,500,000 for the purchase of Notes and upon receipt of written instructions deemed to be in form and substance satisfactory to SRFF in light of the terms of the Offering Memorandum.

C.     *The Notes Issue and RIM Defaults*

28.     Although the minimum $1,500,000 threshold was never reached and SRFF never confirmed that $1,500,000 had been deposited for the purchase of Notes, Entler, Morgan, and nonparty Dominick Sarno ("Sarno") sent SRFF instructions to release the funds from escrow. Entler, Morgan, and Sarno sent these instructions despite knowing that the RIM had not met the Minimum Offering threshold, which was a precondition of releasing the escrowed funds.  SRFF did not investigate or confirm whether the Minimum Offering had been met, or alternatively, knew that the Minimum Offering had not been reached.  SSRFF nevertheless transmitted over one million dollars to an account maintained by RIM Investment Group. SRFF essentially

rubber-stamped its approval of Entler, Morgan, and Sarno's instructions, ignoring its responsibilities to protect Plaintiffs' investments. Subsequently, the Notes were issued in May and June of 2013.

29. None of the invested funds were ever used to purchase or develop the Property. In fact, unbeknownst to Plaintiffs, the Offering Memorandum was issued after RIM had failed to close on the sale of the Property on at least two scheduled closing dates (March 4, 2013 and March 7, 2013). Moreover, the 45-day offering period continued after the option to purchase the Property expired on May 15, 2013.

30. Upon information and belief, shortly after the money was transferred to RIM Investment Group, it was wired to various third-party accounts. A significant amount was transferred to Blue Acquisition Member, LLC ("Blue"). Entler is the sole member of Blue, and Blue was not involved in any way with the transaction. Also, a portion of the funds was transferred to an account personally controlled by Morgan. Upon information and belief, Blue later used part or all of the money that it received from RIM Investment Group to pay for legal fees and expenses incurred by an entity called 1410 Houston Tower, LLC, which is managed by Scott Morgan. These fees and expenses related to an entirely separate real estate transaction in Houston, Texas that Entler and Morgan were pursuing around the same time as the Note offering.

31. That RIM, RIM Investment Group, Bighorn, Entler, and Morgan never intended to use the proceeds from the Notes to acquire the Property is confirmed by the fact that they never transmitted any funds to the title company where the closing was to take place and failed to take any steps to purchase the Property or move forward with the joint venture. Instead, the money simply disappeared into various accounts under Entler's and Morgan's control.

32.    RIM, RIM Investment Group, Bighorn, Entler, and Morgan allowed the purchase option to lapse and refused to tender any sum to revive the option despite already having stolen Plaintiffs' funds. In fact, on May 28, 2013, after the option period expired and RIM, RIM Investment Group, Bighorn, Entler, and Morgan failed to deposit any money with the title company responsible for closing the sale of the Property, Gunn notified RIM, RIM Investment Group, Bighorn, Entler, and Morgan that he had unilaterally negotiated an extension of the purchase option.

33.    To secure the extension, Gunn requested the immediate deposit of $100,000. Of that amount, $50,000 would be paid as consideration to the seller for the extension of the option period and $50,000 would be deposited with the title company to be applied to the purchase price at closing. Although SRFF had released hundreds of thousands of dollars to RIM Investment Group as of May 28, 2013, RIM, RIM Investment Group, Bighorn, Entler, and Morgan refused to tender any sum to revive the purchase option and did not account for any of the amounts received in connection with the sale of the Notes. Moreover, RIM failed to pledge any assets or property as security for the Notes.

34.    While the Notes were being offered, RIM, RIM Investment Group, Bighorn, Entler, and Morgan knew that they did not have sufficient financing in place to purchase or develop the Property and had no intention of moving forward with development efforts. Nevertheless, they continued to work to capture additional investment dollars and secure the release of funds placed in escrow with SRFF even after the purchase option for the Property expired.  As soon as the money was released from escrow, Entler, Morgan, and RIM Investment Group transferred the money to various accounts under Entler's and Morgan's sole control in order to hide their illicit activities.

35.     In making the decision to invest in the Notes, Plaintiffs relied on the various representations set forth in the Offering Memorandum and believed that RIM intended to acquire and develop the Property as described in the Offering Memorandum.

## CAUSES OF ACTION

## VIOLATIONS OF SECTION 10(B) OF THE ACT

36.     Plaintiffs incorporate by reference and re-allege the facts and allegations as set forth above.

37.     RIM, RIM Investment Group, Bighorn, Entler, and Morgan violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

38.     RIM, RIM Investment Group, Bighorn, Entler, and Morgan, singularly and in concert, engaged in a plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, and courses of business which operated as a fraud on Plaintiffs.

39.     RIM, RIM Investment Group, Bighorn, Entler, and Morgan made various untrue statements of material facts and omitted material facts in the Offering Memorandum.  These Defendants were responsible for the content of the Offering Memorandum, which they used to mislead Plaintiffs in order to induce them to invest in and purchase the Notes.  These statements and representations include statements in the Offering Memorandum that the Note offering was subject to a minimum of $1,500,000 in Notes being raised, when in fact Defendants intend to release the escrowed funds without meeting this threshold; that Plaintiffs' funds would be returned to the investors if RIM did not receive and accept subscriptions totaling at least the Minimum Offering, when in fact Defendants intended to, and later did, abscond with the funds without ever reaching the Minimum Offering; and that if the offering terminated for any reason

without closing, Plaintiffs' funds would be promptly refunded, when in fact Defendants intended to take possession of the funds regardless of whether closing occurred.

40.     Additionally, RIM, RIM Investment Group, Bighorn, Entler, and Morgan misrepresented and misled Plaintiffs as to the terms of the options to purchase the property.  The offering period, by its own terms, ran for 45 days from the April 15, 2013 date of the Offering Memorandum.  RIM, RIM Investment Group, Bighorn, Entler, and Morgan knew, however, at the time of issuing the Offering Memorandum, that the closing date was set for May 15—only thirty days from the date of the Offering Memorandum.  These Defendants, therefore, misled Plaintiffs to believe that RIM had more than two weeks longer to obtain financing than it in fact did.  This amounted to a material misrepresentation and critical omission intended to deceive Plaintiffs.

41.     Further, RIM, RIM Investment Group, Bighorn, Entler, and Morgan ordered at least four separate withdrawals from SRFF escrow account.  Notably, three of these four withdrawals took place after the underlying option to purchase the property had expired by its own terms on May 15, 2013.  Given that the real estate transaction had not closed by the time the option had expired, these Defendants requested and retained the money from these three withdrawals knowing full well that the funds would not and could not be used as Plaintiffs had been led to believe.  Defendants, having induced Plaintiffs to invest into the real estate transaction via the Notes, had a duty to disclose that the option to purchase on the Property had expired without closing.  Nevertheless, Defendants failed to disclose such to Plaintiffs, resulting in their continued reliance on the statements and promises contained in the Offering Memorandum.  This allowed Defendants to continue siphoning away the unsuspecting Plaintiffs' money from the SRFF escrow account.

42.     Moreover, RIM, RIM Investment Group, Bighorn, Entler, and Morgan misled Plaintiffs to believe that $500,000 had already been invested towards the Note.  This was presumably done to lend a false sense of validity towards the Note offering in order to entice Plaintiffs to invest.  In reality, the $500,000 referenced in the Offering Memorandum consisted of Gunn's equity investment in the transaction.  Gunn did not invest in the Notes that these Defendants were soliciting.  In fact, initially Gunn was entirely unaware of the Note offering or the Offering Memorandum, as he had been led to believe that RIM, RIM Investment Group, Bighorn, Entler, and Morgan already had the necessary funds to close the transaction.  This fraud is further evidenced by the fact that the Offering Memorandum stated that Gunn's investment was exempted from the requirements to sign the Subscription and SRFF Escrow Agreement. Unbeknownst to Plaintiffs, Gunn initially was unaware of the Offering Memorandum, and to require him to abide by the memorandum's requirements would force RIM, RIM Investment Group, Bighorn, Entler, and Morgan to disclose the Note offering's existence to him.  These provisions exempting Gunn from abiding by the Offering Memorandum were not included for his convenience, but rather in order to allow these Defendants to perpetrate their fraud on Plaintiffs without Gunn's discovery.

43.     Further, the Offering Memorandum explicitly represented that the funds would be applied towards the purchase, development, and construction of the Property and marketing and offering expenses.  RIM, RIM Investment Group, Bighorn, Entler, and Morgan made these representations knowing that they were complete fabrications.  As was revealed after the funds broke escrow, a significant portion of the $1 million raised was sent to bank accounts controlled solely by Entler and Morgan that were wholly unrelated to the Property or the transaction.

44.     The Defendants' fraud does not stop there however.  Despite the fact that the Minimum Offering was never reached and the Property was never closed upon, RIM issued the Notes, which were signed by Morgan.  These Notes were dated May 8, 2013—before the expiration of the closing period.  The issuance of these Notes unequivocally demonstrates RIM's and Morgan's attempts to defraud Plaintiffs, as it shows that they intended to procure Plaintiffs' funds and issue the Notes regardless of closing on the Property.  Further, because these Notes were only to issue if the Minimum Offering was reached and all preconditions were met, which they were not, Morgan and RIM made an implicit representation that those conditions had been met.  That representation was patently false.

45.     Plaintiffs relied on the Offering Memorandum and the untrue facts and misrepresentations that RIM, RIM Investment Group, Bighorn, Entler, and Morgan included in the Offering Memorandum regarding their intentions to develop the Property and participate in the joint venture.  Had Plaintiffs known of the litany of materially adverse information they would not have invested.

46.     Plaintiff, as a result of RIM, RIM Investment Group, Bighorn, Entler, and Morgan's fraud, suffered significant harm.  They have not recovered their investments and have not received any interest due under the Notes.  Moreover, because RIM never closed on the property, it never pledged the agreed upon security in exchange for the Notes, further harming Plaintiffs.

## **FRAUD**

47.     Plaintiffs incorporate by reference and re-allege the facts and allegations as set forth above.

48.     RIM, RIM Investment Group, Bighorn, Entler, and Morgan are liable to Plaintiffs for common law fraud. They engaged in fraud by employing devices, schemes, and conspiracies to defraud Plaintiffs by making untrue statements of material facts and failing to disclose material facts critical to Plaintiffs' decisions' to invest.  These statements and omissions rendered the Offering Memorandum fraudulent and misleading and were done with the purpose of inducing Plaintiffs reliance upon them.

49.     These statements and representations include statements in the Offering Memorandum that the Note offering was subject to a minimum of $1,500,000 in Notes being raised, when in fact Defendants intended to release the escrowed funds without meeting this threshold; that Plaintiffs' funds would be returned to the investors if RIM did not receive and accept subscriptions totaling at least the Minimum Offering, when in fact Defendants intended to, and later did, abscond with the funds without ever reaching the Minimum Offering; and that if the offering terminated for any reason without closing, Plaintiffs' funds would be promptly refunded, when in fact Defendants intended to take possession of the funds regardless of whether closing occurred.

50.     Additionally, RIM, RIM Investment Group, Bighorn, Entler, and Morgan misrepresented and misled Plaintiffs as to the terms of the options to purchase the property.  The offering period, by its own terms, ran for 45 days from the April 15, 2013 date of the Offering Memorandum.  RIM, RIM Investment Group, Bighorn, Entler, and Morgan knew, however, at the time of issuing the Offering Memorandum, that the closing date was set for May 15—only thirty days from the date of the Offering Memorandum.  These Defendants, therefore, misled Plaintiffs to believe that RIM had more than two weeks longer to obtain financing than it in fact

did. This amounted to a material misrepresentation and critical omission intended to deceive Plaintiffs.

51.    Further, RIM, RIM Investment Group, Bighorn, Entler, and Morgan ordered at least four separate withdrawals from SRFF escrow account. Notably, three of these four withdrawals took place after the underlying option to purchase the property had expired by its own terms on May 15, 2013. Given that the real estate transaction had not closed by the time the option had expired, these Defendants requested and retained the money from these three withdrawals knowing full well that the funds would not and could not be used as Plaintiffs had been led to believe. Defendants, having induced Plaintiffs to invest into the real estate transaction via the Notes, had a duty to disclose that the option of sale on the Property had expired without closing. Nevertheless, Defendants failed to disclose such to Plaintiffs, resulting in their continued reliance on the statements and promises contained in the Offering Memorandum. This allowed Defendants to continue siphoning away the unsuspecting Plaintiffs' money from the SRFF escrow account.

52.    Moreover, RIM, RIM Investment Group, Bighorn, Entler, and Morgan misled Plaintiffs to believe that $500,000 had already been invested towards the Note. This was presumably done to lend a false sense of validity towards the Note offering in order to entice Plaintiffs to invest. In reality, the $500,000 referenced in the Offering Memorandum consisted of Gunn's equity investment in the transaction. Gunn did not invest in the Notes that these Defendants were soliciting. In fact, initially Gunn was entirely unaware of the Note offering or the Offering Memorandum, as he had been led to believe that RIM, RIM Investment Group, Bighorn, Entler, and Morgan already had the necessary funds to close the transaction. This fraud is further evidenced by the fact that the Offering Memorandum stated that Gunn's investment

was exempted from the requirements to sign the Subscription and SRFF Escrow Agreement. Unbeknownst to Plaintiffs, Gunn initially was unaware of the Offering Memorandum, and to require him to abide by the memorandum's requirements would force RIM, RIM Investment Group, Bighorn, Entler, and Morgan to disclose the Note offering's existence to him. These provisions exempting Gunn from abiding by the Offering Memorandum were not included for his convenience, but rather in order to allow these Defendants to perpetrate their fraud on Plaintiffs without Gunn's discovery.

53.     Further, the Offering Memorandum explicitly represented that the funds would be applied towards the purchase, development, and construction of the Property and marketing and offering expenses. RIM, RIM Investment Group, Bighorn, Entler, and Morgan made these representations knowing that they were complete fabrications. As was revealed after the funds broke escrow, a significant portion of the $1 million raised was sent to bank accounts controlled solely by Entler and Morgan that were wholly unrelated to the Property or the transaction.

54.     Despite the fact that the Minimum Offering was never reached and the Property was never closed upon, RIM issued the Notes, which were signed by Morgan. These Notes were dated May 8, 2013—before the expiration of the closing period. The issuance of these Notes unequivocally demonstrates RIM's and Morgan's attempts to defraud Plaintiffs, as it shows that they intend to procure Plaintiffs' funds and issue the Notes regardless of closing on the Property. Further, because these Notes were only to issue if the Minimum Offering was reached and all preconditions were met, which they were not, Morgan and RIM made an implicit representation that those conditions had been met. That representation was patently false.

55.     Without knowledge of the false and misleading nature of RIM, RIM Investment Group, Bighorn, Entler, and Morgan's various representations and omissions, Plaintiffs relied, to

their detriment, on the representations regarding: these Defendants' development plans; their ability to secure financing; their intent to close on the sale of the Property; the use of any invested sums; and these Defendants' intentions to ensure that Plaintiffs' funds were return to them if the conditions of the Note offering were not met.  Plaintiffs suffered substantial harm as a result of their reliance on RIM, RIM Investment Group, Bighorn, Entler, and Morgan's fraudulent and false statements and non-disclosures. Accordingly, Plaintiffs are entitled to recover out-of-pocket damages to reimburse them for the amounts paid for the Notes, as well as exemplary damages for these Defendants' fraudulent conduct.

## VIOLATION OF THE TEXAS SECURITIES ACT

56.     Plaintiffs incorporate by reference and re-allege the facts and allegations as set forth above.

57.     RIM, Bighorn, Entler, and Morgan are liable to Plaintiffs for violation of Section 33 of the Texas Securities Act, TEX. REV. CIV. STAT. art. 581-33, *et seq*.  RIM offered and sold securities, *i.e.*, the Notes, to Plaintiffs by means of using untrue statements of material fact and failing to state material facts that were necessary to prevent other statements from being misleading in light of the circumstances in which they were made.  These include stating that Plaintiffs' funds would be returned to them if RIM did not close on the Property; that Plaintiffs' funds would remain in escrow until RIM reached the Minimum Offering; that $500,000 had been previously committed towards the purchase of Notes; and that RIM would issue Notes secured by the Property and all other assets held by RIM.  Further, RIM failed to inform Plaintiffs that the option to purchase the Property expired without RIM closing on the sale.  Yet, RIM continued to order that Plaintiffs' money be released from escrow on at least three separate

occasions after the option had expired and the underlying purpose of the Note offering had been defeated.

58.     Bighorn, Entler, and Morgan are liable for aiding RIM in the wrongful solicitation and sale of the Notes.   These three were generally aware of their role in RIM's violation. Bighorn served as the "Financier/Facilitator" of the deal.   Entler was the sole owner of Bighorn, and Morgan was the managing member of the RIM.   Both were actively involved in all levels of the Note offering and hid the Note offering from the other parties to the Property transaction. Furthermore, once the money was improperly released from escrow into RIM Investment Group's bank account, much of the money was transferred to bank accounts under the sole control of Entler and Morgan.   All three of these defendants rendered substantial assistance to RIM.   Entler and Morgan were in complete control of Bighorn's and RIM's operations, and as such, were the individuals primarily responsible for RIM's actions.    All three of these Defendants acted with the intention to deceive Plaintiffs or acted with reckless disregard for the truth of the representations made by RIM.

59.     At all relevant times, Plaintiffs had no knowledge of RIM's, Bighorn's, Entler's, and Morgan's misrepresentations, omissions, and fraudulent practices.

60.     As a direct and proximate result of Defendants' misrepresentations, omissions, and fraudulent practice, Plaintiffs have suffered significant financial damages.

## BREACH OF CONTRACT - NOTES

61.     Plaintiffs incorporate by reference and re-allege the facts and allegations as set forth above.

62.     RIM is liable to Plaintiffs for breach of contract. The Notes matured 180 days after issuance, and RIM promised to repay all sums due and owing at or before maturity along with 10% or 12.5% interest.

63.     Following maturity, Plaintiffs made demand on RIM for payment of all sums due under the Notes. Despite such demand, RIM failed and refused to tender payment and is in breach of the Notes. All conditions precedent to Plaintiffs' recovery in full for breach of contract have occurred, been waived, or have been performed.

64.     Plaintiffs are entitled to recover the sums due and owing from RIM under the Notes, along with interest at the rate of 12.5% per annum. Plaintiffs have retained Winstead PC to prosecute their claim for breach of contract and have agreed to pay Winstead PC reasonable and customary attorneys' fees incurred in the prosecution of this action. Accordingly, Plaintiffs seek a recovery of reasonable and necessary attorneys' fees.

## BREACH OF CONTRACT – SUBSCRIPTION AGREEMENT

65.     Plaintiffs incorporate by reference and re-allege the facts and allegations as set forth above.

66.     RIM is also liable to Plaintiffs for breach of the Subscription Agreements. The Subscription Agreement explicitly incorporates the terms of the Offering Memorandum.  Among those terms is RIM's agreement that Plaintiffs' funds would be returned to them if the Property was not closed upon in accordance with terms of the Offering Memorandum.

67.     RIM did not close upon the Property, and thus, was contractually obligated to ensure that Plaintiffs' funds were returned to them.  RIM, however, instructed SRFF to release the escrow funds to RIM Investment Group in direct violation of the Subscription Agreement.  RIM's actions amount to a material breach of the Subscription Agreement, which has led to substantial injury to Plaintiffs.

68.     All conditions precedent to Plaintiffs' recovery in full for breach of contract have occurred, been waived, or have been performed.

69.     Plaintiffs are entitled to recover the sums due and owing from RIM under the Subscription Agreements, along with interest at the maximum rate allowed under the law.  Plaintiffs have retained Winstead PC to prosecute their claim for breach of contract and have agreed to pay Winstead PC reasonable and customary attorneys' fees incurred in the prosecution of this action.  Accordingly, Plaintiffs seek a recovery of reasonable and necessary attorneys' fees.

## MONEY HAD AND RECEIVED/ASSUMPSIT

70.     Plaintiffs incorporate by reference and re-allege the facts and allegations as set forth above.

71.     Plaintiffs sue RIM, RIM Investment Group, Bighorn, Entler, and Morgan for money had and received. RIM, RIM Investment Group, Bighorn, Entler, and Morgan hold money that belongs to Plaintiffs in equity and good conscience. Plaintiffs have made demand for the return of such money; however, RIM, RIM Investment Group, Bighorn, Entler, and Morgan continue to wrongfully withhold and retain all sums paid by Plaintiffs to purchase the Notes under the Offering Memorandum. Accordingly, Plaintiffs sue RIM, RIM Investment Group,

Bighorn, Entler, and Morgan for money had and received and assumpsit to recover all sums improperly received and retained by RIM, RIM Investment Group, Bighorn, Entler, and Morgan.

## **BREACH OF ESCROW AGREEMENT**

72.     Plaintiffs incorporate by reference and re-allege the facts and allegations as set forth above.

73.     Plaintiffs sue SRFF for breach of the Escrow Agreement. In the Offering Memorandum, RIM included an Escrow Agreement that outlined the terms and conditions of SRFF's role as escrow agent for the offering.

74.     Under the Escrow Agreement, SRFF would act as the escrow agent for all funds received for the purchase of Notes, and SRFF would release and transmit such funds in accordance with the Offering Memorandum upon, among other things, confirmation of receipt of funds of at least $1,500,000 for the purchase of Notes.  Pursuant to the terms of the Escrow Agreement, SRFF agreed only to release funds upon receipt of satisfactory instructions from RIM and "the Placement Agent."

75.      The minimum $1,500,000 threshold was never satisfied and SRFF never received confirmation that $1,500,000 had been deposited for the purchase of the Notes. SRFF nevertheless improperly transmitted approximately one million dollars to an account maintained by RIM Investment Group without authorization from Plaintiffs and without confirming that the Minimum Offering threshold had been met. Rather, SRFF simply released the money when Entler, Sarno, and Morgan instructed it to and failed to make any independent determination that the instructions were satisfactory or that the conditions precedent to breaking escrow had been fulfilled.  Subsequently, the Notes were issued in May and June of 2013 and the funds were

retained even though the minimum investment amount was never deposited with SRFF and RIM was never in a position to close on the Property.

76.     SRFF's actions thus constituted a breach of the Escrow Agreement that resulted in significant injury to Plaintiffs.

## **BREACH OF FIDUCIARY DUTY**

77.     Plaintiffs incorporate by reference and re-allege the facts and allegations set forth above.

78.     Plaintiffs sue SRFF for breach of its fiduciary duties as escrow agent.  As escrow agent, SRFF owed certain fiduciary duties to both RIM and to Plaintiffs, including the duty of loyalty; the duty to make full disclosure; the duty to exercise a high degree of care to conserve the money placed in escrow and pay it only to those persons entitled to receive it; and the duty to act with utmost good faith.  Further, SRFF had a fiduciary duty not to deliver the monies in escrow except upon strict compliance with the conditions imposed by the Escrow Agreement.

79.     The Escrow Agreement specifically authorized SRFF only to release the escrowed funds upon delivery of written instructions in a form and substance satisfactory to the Escrow Agent.  SRFF, however, disregarded its fiduciary duties when it released funds from escrow without ensuring that it had received satisfactory instructions.  Particularly, SRFF did not ensure that the Minimum Offering had been reached and that all necessary preconditions had been met. Further, SRFF did not investigate or ensure that the proper subscription and other agreements had been properly executed prior to breaking escrow.  Had SRFF done so, it would have realized that RIM Investment Group had no right to the funds and that SRFF was thus charged with returning the escrowed money to Plaintiffs.

80.     Because the Minimum Offering was not reached, all necessary preconditions had not been met, and all subscription and other agreements had not been properly executed, RIM was not entitled to any of the escrowed funds.  SRFF thus breached its fiduciary duties as escrow agent when it released the escrowed funds to RIM.

81.     Since the escrowed funds were released, Defendants have absconded with the funds causing significant financial injury to Plaintiffs.

## JURY TRIAL DEMANDED

82.     Plaintiffs demand a jury trial pursuant to FED. R. CIV. P. 38(b).

## CONCLUSION AND PRAYER

As a result of Defendants' wrongful conduct, Plaintiffs suffered substantial harm and are entitled to actual damages. Plaintiffs are also entitled to exemplary damages, reasonable and necessary attorney's fees, and costs of court. Plaintiffs are entitled to pre-judgment and post-judgment interest as provided for under the Notes and by law.

Plaintiffs respectfully pray that upon final trial, that Plaintiffs be award from Defendants: (1) actual and exemplary damages; (2) pre-judgment interest on all sums awarded as provided by law; (3) reasonable attorneys' fees; (4) costs of court and other recoverable expenses; (5) post-judgment interest as provided by law; and (6) such other and further relief to which they may be justly entitled.

Respectfully submitted,

By: _____ */s/ Alex S. Valdes* _____
  James G. Ruiz
  State Bar No. 17385860
 Alex S. Valdes
 State Bar No. 24037626
 Scott F. Courtney Jr.
 State Bar No. 24084384

**WINSTEAD PC**

  401 Congress Avenue, Suite 2100
  Austin, Texas 78701
  (512) 370-2800
  (512) 370-2850 (Fax)
  jruiz@winstead.com
  avaldes@winstead.com
  scourtney@winstead.com

**ATTORNEYS FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was field in accordance with Local Rule CV-5 and served on all known counsel of record via the Court's ECF Filing System on July 9, 2015.

   */s/ Alex S. Valdes* _____
   Alex S. Valdes