UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BARRY BATSON, et al.,** | |
| **Plaintiffs,** | |
| -against- | **15-cv-07576 (ALC)** |
| **RIM SAN ANTONIO ACQUISITION, LLC,** | **OPINION AND ORDER** |
| **et al.,** | |
| **Defendants.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs charge Defendant Sichenzia Ross Friedman Ference, LLP ("Sichenzia") with

violations of state securities laws, breach of escrow agreement, breach of fiduciary duty, aiding

and abetting fraud, and negligence. Before this Court is Sichenzia's motion to dismiss Plaintiffs'

Fourth Amended Complaint ("FAC") for failure to state any claims against it. For the following

reasons, Sichenzia's motion is GRANTED.

## BACKGROUND

### I.    Factual Background

The following facts are taken from the allegations contained in Plaintiffs' FAC as well as

the parties' declarations submitted in connection with the instant motion to dismiss. Plaintiffs'

allegations are presumed true for the purposes of this motion to dismiss.

In early 2013, Gunn & Partners, LLC ("Gunn & Partners") entered into an agreement

with Bighorn Capital, Inc. ("Bighorn") to purchase property in San Antonio, Texas (the

"Property") and then construct an apartment complex on the Property known as RIM ("RIM

Project"). FAC ¶ 20-21. The entities planned to (1) enter into a limited liability operating agreement to form RIM and (2) simultaneously close on the Property. *Id.* ¶¶ 21; 23. In order to form RIM, Gunn & Partners was to contribute $500,000 in equity and Bighorn was to contribute $3,500,000 in equity ("RIM Transaction"). *Id.* ¶ 23.

The entities never formed RIM. On three separate occasions in March and April 2013, the parties were set to close, but Bighorn failed to provide his equity contribution. *Id.* ¶¶ 24-25.

## A. The RIM Offering

Meanwhile, Bighorn, Robert R. Entler ("Entler")—the President and Director of Bighorn—and Scott Morgan ("Morgan") created the "RIM Offering." *Id.* ¶ 26. The RIM offering was a private offering of 10% Promissory Notes purportedly to raise money for the RIM Project. *Id.*

Bighorn engaged John Carris Investments LLC ("Carris") as the exclusive placement agent for the RIM Offering. *Id.* ¶ 26. For this work, Carris would receive a broker's placement fee equal to 8% of the funds raised if the RIM offering closed. *Id.* ¶ 73. At that time, Carris provided various financial advisory services. *Id.* ¶ 27. In August 2014, Carris was expelled from the securities industry for fraud and suitability violations. *Id.*

Carris hired Sichenzia, a New York-based securities firm, to represent it as placement agent counsel in connection with the RIM Offering. *Id.* Sichenzia eventually assumed other roles with respect to the RIM Offering, including (1) drafting the Offering Memorandum, Notes, and Security Agreements; (2) serving as escrow agent; (3) accepting subscription payments and depositing such funds into its IOLA account; (4) serving as Collateral Agent under the Security Agreement for the benefit of Plaintiffs; and (5) agreeing to deliver the Notes to Plaintiffs upon closing or to refund the subscription payments to Plaintiffs if no closing occurred. *Id.* ¶¶ 34; 73-

74; *see also* Pl Supp Mem at 8. Plaintiffs allege that Carris unilaterally appointed Sichenzia as Collateral Agent even though the Security Agreement provided that the investors would appoint the Collateral Agent. FAC ¶ 73.

Plaintiffs further allege that the agreement did not provide for Sichenzia to be paid legal fees out of the escrow funds. *Id.* However, Sichenzia received approximately $41,000 in fees in connection with the RIM Offering, which were paid out of the escrow funds. *Id.*

### i.  The Offering Memorandum

Sichenzia drafted the Offering Memorandum for the RIM Offering. *Id.* ¶ 29. Sichenzia did not speak with Entler, Morgan or Gunn about the proposed RIM Project before drafting the Offering Memorandum. *Id.* However, Entler and Morgan knew about, consented to, authorized, and/or assisted with its preparation. *Id.* ¶ 35.

The Memorandum, dated April 15, 2013, described the RIM Offering as a private offer and sale of up to $8,500,000 10% Promissory Notes ("Notes") in connection with the proposed development project on the Property. *Id.* ¶ 29. Under the Offering Memorandum, qualified subscribers would be issued Notes secured under a Security Agreement that granted a subscriber a first priority security interest against all of RIM's assets, including the Property to be purchased. *Id.* ¶ 63. The Notes matured 180 days after issuance, at which time full payment would be due. *Id.* If the Notes were repaid within 90 days of issuance, interest would accrue at 10% per annum; otherwise, the interest rate would increase to 12.5% per annum. *Id.* Additionally, Section 5 of the Note provided that the right to payment would be "senior to all debt of Borrower." *Id.* However, Plaintiffs allege that Section 5 was false because the Bank of the Ozarks was to obtain a first priority lien on the assets at the time the RIM Transaction closed. *Id.* The Bank's right would be superior to any rights obtained by subscribers. *Id.* Finally, the

Security Agreement promised to deliver a perfected security interest in the Property. *Id.* ¶ 64.

Forms of the Note and Security Agreement that were to be issued were attached to the Offering

Memorandum. *Id.*

The Offering Memorandum states that the summary of the offering is "for discussion

purposes only and does not create any binding legal obligations, rights, or duties." Offering

Memorandum (ECF No. 154-2 at 4). Instead, such binding obligations "will be set forth, if at all,

in definitive transaction documents relating to the Transaction." *Id.*

### ii. Subscription Agreement

Section 1.1 of the Subscription Agreement states that some subscribers had already

deposited funds with Heritage Title. FAC ¶ 72. However, Plaintiffs allege that no subscribers

had done so in connection with the RIM Offering. *Id.*

Under the Subscription Agreement, the Notes purchased by subscribers were to be

delivered within 15 business days following the closing. *Id.* ¶ 74.

### iii. Solicitation of Investors

Entler and Mark Caspers made a presentation to Carris' investment brokers as part of

their efforts to secure potential investors. *Id.* ¶ 34. They represented that Caspers would develop

the project and would protect Carris' clients' money because they were well funded and had an

excellent track record. *Id.* Plaintiffs allege that Entler and Caspers knew that Carris would

convey this information to his clients, including Plaintiffs, to induce them into investing in the

RIM Offering. *Id.*

Plaintiffs Barry Batson, David Douthat, William Langer Gokey, the William Langer and

Susan Flickinger Gokey Foundation, Inc., Quentin Kramer, Charles Mortimer, Michael Solkow,

James Wilson, as Trustee for the James D. Wilson Trust, and Worthington Enterprises, Inc.

(collectively, "Plaintiffs") became aware of the Offering in April or May of 2013 and reviewed an Offering Memorandum describing the terms. *Id.* ¶¶ 36, 39, 42, 44, 47, 50, 53, 57.

Plaintiffs contend that the Offering Memorandum contained several misrepresentations. For example, the Memorandum did not disclose that RIM never entered into an agreement with Gunn & Partners to develop the Property and that, accordingly, there was no assignment of the Purchase and Sale Agreement relating the Property to RIM. *Id.* ¶ 30. Thus, the actual intended use of the proceeds was for Bighorn to raise its $3,500,000 equity contribution to form the joint venture and obtain the rights to buy the Property—not to purchase the property. *Id.* Further, the Offering Memorandum falsely stated that Gunn was a managing member of RIM, even though the joint venture had never been formed. *Id.* ¶ 31. Moreover, the Offering Memorandum did not disclose that Bighorn had negotiated at least two other separate deals in Texas alone similar to the one contemplated by the RIM Offering and failed to purchase the property each time, resulting in lawsuits against Bighorn and/or Entler. *Id.* Finally, the Offering Memorandum did not disclose Entler's criminal history, which includes a felony embezzlements charge and a cease and desist order for illegal lending activities. *Id.* ¶ 32.

Plaintiffs all invested in the RIM Offering. They allege that if the above information had been disclosed to them, they would not have done so. *Id.* ¶ 33.

**B. The Release of Funds**

Gunn provided the RIM Defendants with wiring instructions to Commonwealth Title to close the sale of the Property on May 13, 2013. *Id.* ¶ 66.[1] That day, Gunn wired his $500,000 equity investment. *Id.* Defendants had raised $1,474,650 from the RIM Offering, which Sichenzia was holding in escrow in its IOLA account. *Id.* However, they did not release the

---

[1] On at least two occasions, Plaintiffs state that the closing date was May 13, 2015. *See, e.g.*, FAC ¶ 66. The Court presumes Plaintiffs intended to write May 13, 2013.

funds on the closing date. In fact, much of Defendants' funds had been released in advance of the closing.

Beginning around April 30, 2013, the RIM Defendants had begun pressuring Carris to allow the release of escrow funds to a RIM Investment Group bank account in Nevada. The RIM Investment Group was a new company controlled by Entler and unrelated to RIM. *Id.* The RIM Defendants contacted Sichenzia directly to represent that Carris had authorized the release of funds by that date. *Id.*

On May 8, 2013, Sichenzia, "taking directions from its client, Carris," wired approximately $901,570 in escrow funds to RIM Investment Group. *Id.* On that date, RIM Investment Group, in turn, transferred that money to Blue Acquisition ($550,000 and $75,000)— an entity to which Entler was the sole member—Durango Gravel LLC ($50,000 and $25,000), and Morgan ($50,000). *Id.* ¶ 67. RIM Investment Group also paid over $100,000 to Hughes Airport LLC, Dorsey Partners Property Corp and Standard Ventures. None of these groups were involved with the RIM Project. *Id.*

Sichenzia wired additional funds to RIM Investment Group on May 16, 2013 ($155,391.20), May 23, 2013 ($71,150), and June 4, 2013 ($35,500). *Id.* ¶ 68. Sichenzia did not transfer any money to Commonwealth Title on the May 13, 2013 scheduled closing date. *Id.* Sichenzia also did not notify Plaintiffs that it was releasing escrow funds before the RIM Offering closed. *Id.* ¶ 76.

On May 28, 2013, Gunn notified the RIM Defendants that he had unilaterally negotiated an extension of the purchase option with the seller of the Property. *Id.* ¶ 70. As consideration for an extension of the option period, Gunn requested that Bighorn (Entler) immediately deposit $100,000 with Heritage Title. *Id.* By this point, Sichenzia had released over $1 million dollars

to the RIM Defendants. *Id.* However, the RIM Defendants refused to tender any money to revive the purchase option. *Id.* As a result, Gunn terminated the Term Sheet between it and Bighorn, and no longer intended to assign the Purchase and Sale Agreement to RIM. *Id.*

### C. Delivery of the Notes

On their face, the Notes indicate that the Original Issue Date was May 8, 2013. *Id.* ¶ 77. However, Sichenzia actually delivered the Notes to Plaintiffs on or after September 17, 2013. *Id.* At this point, the initial 90-day repayment period had already expired. *Id.* Sichenzia did not provide an explanation for the delay. *Id.*

Further, the Notes delivered to Plaintiffs differed from those the Plaintiffs were to receive under the Offering Memorandum, in that page three of the form of Promissory Note was omitted. *Id.* ¶ 78. Page three provided, in relevant part, "This Note is secured by a security interest in all of the assets of the Borrower." *Id.* Additionally, Sichenzia withheld signed Security Agreements from Plaintiffs, although it received the signature pages for the Security Agreements from Morgan. *Id.* ¶ 79.

Plaintiffs contend that, as the drafter of the Notes, Sichenzia knew it had removed the provisions granting Plaintiffs a security interest in RIM's assets. *Id.* ¶ 78. According to Plaintiffs, Sichenzia altered the Notes and withheld the Security Agreements to conceal the fact that RIM never obtained any right to purchase the Property and thus could not construct the apartment community—the purported purpose of this investment. *Id.*

RIM never received any funds from the RIM Offering. *Id.* ¶ 83. Additionally, the FAC notes that upon the closing of the RIM Offering, Entler, Morgan, Carris, and Sichenzia began a new offering to secure funds from additional investors in connection with another Texas real

estate development project, which Plaintiffs contend was "a continuation of the RIM Defendants' Ponzi scheme." *Id.*

## II.     Procedural History

Plaintiffs initiated this action in the Western District of Texas on May 7, 2015. ECF No. 1. By order dated September 17, 2015, the Honorable Robert L. Pitman directed that this case be transferred to the Southern District of New York, where it was assigned to this Court. ECF No. 31.

Plaintiffs filed a second amended complaint on January 28, 2016. ECF No. 61 ("SAC"). Sichenzia and the RIM Defendants filed motions to dismiss the SAC, and those motions were fully submitted on April 8, 2016. *See* ECF Nos. 64-66, 70-78. On November 22, 2016, this Court granted in part and denied in part RIM Defendants' motion to dismiss, and granted Sichenzia's motion to dismiss. ECF No. 79 ("MTD Opinion").[2]  In its Order, the Court denied Plaintiffs' leave to amend their claims based on (1) the Minimum Offering Amount; (2) the Offering period or RIM's time to purchase the Property; and (3) the Interest Reserve. *Id.* at 34.

On January 12, 2017, Plaintiffs' filed their third amended complaint. ECF No. 87 ("TAC"). RIM Defendants answered the complaint on March 24, 2017. ECF No. 98. On March 15, 2017, Sichenzia filed a motion to dismiss. ECF Nos. 94-96 ("Def Mem"). Plaintiffs responded in opposition on April 14, 2017. ECF No. 107 ("Pl Mem"). Sichenzia replied on April 21, 2017. ECF No. 108 ("Def Reply").

On December 20, 2017, this Court permitted Plaintiffs to file a fourth amended complaint ("FAC"). ECF No. 153. Plaintiffs filed their FAC on December 22, 2017. ECF No. 154. Sichenzia elected to apply its pending motion to dismiss to the FAC, and this Court set a

---

[2] To date, defendant John Carris has not appeared in this action.

schedule for supplemental briefing to respond to new allegations contained in the FAC. *See* ECF Nos. 152; 153. Sichenzia filed its supplemental brief in support of its motion to dismiss on January 16, 2018. ECF Nos. 156-58 ("Def Supp Mem"). Plaintiffs responded on February 23, 2018. ECF No. 161 ("Pl Supp Mem"). Sichenzia filed its reply brief on March 12, 2018. ECF No. 162 ("Def Supp Reply").

Accordingly, the Court considers this matter fully submitted.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it

rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

In addition to the factual allegations in the complaint, the court also may consider "'the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.'" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quoting *McCarthy v. Dun & Badsheet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)). Where these documents contradict the allegations in a complaint, the court need not accept those conclusory allegations as true. *See I. Meyer Pincus and Assoc. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).

Where, as here, Plaintiffs have alleged fraud claims the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement, a complaint must "'(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).

## DISCUSSION

## I.   Law of the Case

As an initial matter, the parties disagree over whether this Court's rulings on the Defendant's motion to dismiss Plaintiffs' SAC constitute law of the case. The law of the case

doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" unless the decision "is clearly erroneous and would work a manifest injustice." *Arizona v. California*, 460 U.S. 605, 618 & n.8 (1983). The doctrine is discretionary with regard to a court's own decisions. *Id.*; *accord Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996).

"The mere filing of an Amended Complaint does not entitle Plaintiff to relitigate his claims absent new factual allegations." *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015). The law of the case doctrine "counsels against reconsideration" where amended pleadings are "very similar" to the previous complaint." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Mallela*, No. 00-4293, 2002 WL 31946762, at *8 (E.D.N.Y. Nov. 21, 2002)). In contrast, "'the law of the case' doctrine does not control" if an amended complaint "alleges materially different and more detailed claims" than the initial complaint. *Kregler v. City of N.Y.*, 821 F. Supp. 2d 651, 658 (S.D.N.Y. 2011). Courts "examine the Amended Complaint to determine whether plaintiffs have cured the former deficiencies." *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-2923, 1996 WL 383135 at *1 (S.D.N.Y. July 9, 1996).

Accordingly, this Court will examine the FAC and apply the law of the case doctrine to those claims that do not contain new factual allegations.

## II. State Securities Law Violations[3]

Plaintiffs assert that Sichenzia is liable under various states' "Blue Sky" laws. They contend that Sichenzia drafted the Offering Memorandum without speaking with the RIM Defendants, evincing a reckless disregard for the truth of its statements. Pl Supp Mem at 11.

---

[3] Plaintiffs have withdrawn their Illinois Security Act claim. *See* Pl Supp Mem at 10 n.1.

Further, Sichenzia's alteration of the Notes and its assumption of the duties as escrow and collateral agent "to maintain complete control over the transaction" establish actual awareness of wrongdoing. *Id.*

Defendant responds that such allegations are insufficient to state a claim under any state's securities laws because Plaintiffs do not plausibly allege that Sichenzia either had actual knowledge of the alleged fraud or solicited investments from Plaintiffs. Def Supp Mem at 8; Def Supp Reply at 5.[4]

The Court will address each state's law in turn.

## A. Texas Securities Claims

### i. Section 33 of Texas Securities Act

Section 33 of the Texas Securities Act creates liability for sellers, buyers, and nonselling issuers which register when such individuals make untrue statements of material facts or omit material facts necessary to make the statements not misleading under the circumstances. Vernon's Tex. Civ. Stat. Art. 581-33(A), (B), (C). Additionally, a person who "directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security" is jointly and severally liable. *Id.* at (F).

An "alleged aider can only be held liable if it rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator.'" *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 842 (Tex. 2005) (citations omitted). In turn, in order to perceive a risk, "the alleged aider must possess a 'general awareness that his role was part of an overall activity that is improper.'" *Id.* (quoting *Gould v. American-Hawaiian*

---

[4] Defendant also contests that Sichenzia served as Collateral Agent. Def Supp Reply at 15. However, that is a question of fact that cannot be resolved at the motion to dismiss stage.

*S. S. Co.*, 535 F.2d 761, 780 (3d Cir. 1976)). The Act, however, "does not require the aider to have had direct dealing with the defrauded party." *Id.* at 843.

Here, Plaintiffs do not allege that Sichenzia was a buyer, seller, or nonselling issuer of the securities at issue. Accordingly, it could only be held secondarily liable under Section F. However, Plaintiffs do not plausibly allege that Sichenzia possessed a "general awareness" of the alleged fraud. Allegations that Sichenzia drafted the Offering Memorandum, and that the Memorandum contained misleading statements, are insufficient to show that Sichenzia actually knew the content of that Memorandum was misleading. Indeed, Plaintiffs' own allegations belie such claims: Plaintiffs contend that Sichenzia "did not have any discussions" with Morgan, Entler, or Gunn "about the RIM Offering or the underlying transaction for which the investment funds were sought." Pl Supp Mem at 7. Such allegations make it even less plausible that Sichenzia knew of any alleged fraud. *See, e.g., Johnson v. Norton*, No. 92-6844, 1993 WL 465333, at *18 (S.D.N.Y. Nov. 10, 1993) (citing *Devaney v. Chester*, 813 F.2d 566, 568-69 (2d Cir. 1987)) ("Assuming that the documents at issue contained false and misleading information, plaintiffs do not allege any specific facts as to how and when the attorney defendants learned that the documents contained false and misleading information.").

### ii. Section 27.01 of Texas Business & Commerce Code

Section 27.01 prohibits the false representation of a material fact that is "made to a person for the purpose of inducing that person to enter into a contract" and "relied on by that person in entering into that contract." Vernon's Tex. Code § 27.01. It also creates liability for one who has actual awareness of another's false representation, fails to disclose the falsity of the representation to the person defrauded, and benefits from the false representation. *Id.* at (d).

Actual awareness "may be inferred where objective manifestations indicate that a person acted with actual awareness." *Id.* at (c).

As discussed *supra*, Plaintiffs' allegations are insufficient to show actual awareness.

**B. Florida Securities and Investors Protection Act**

Florida law prohibits any person from employing, in connection with the offer, sale, or purchase of an investment or security, "any device, scheme, or artifice to defraud" or "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person." Fla. Stat. §§ 517.301(1)(a)(1), (3). To state a claim, the "'plaintiff must establish the following: (1) a misrepresentation or omission of a material fact; (2) justifiably relied on; (3) that the misrepresentation or omission was made in connection with a purchase or sale of securities [or any investment]; (4) with scienter or reckless disregard as to the truth of the communications; and (5) that the untruth was the direct proximate cause of the loss.'" *Sgaliordich v. Lloyd's Asset Management*, No. 10-3669, 2012 WL 4327283, at *7 (E.D.N.Y. Sept. 20, 2012) (quoting *Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 380-81 (S.D. Fla. 1999)). Under this statute, "[s]cienter can be established by 'a showing of mere negligence.'" *Id.* (quoting *Profilet*, 231 B.R. at 380-81).

Nevertheless, a "plaintiff must also satisfy the pleading requirements of Rule 9(b)." *Id.* (citations omitted). With respect to scienter, "even for claims based on mere negligence" the plaintiff must plead "with particularity facts giving rise to a strong inference that a defendant acted with the requisite state of mind." *Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 2d 578, 587 (S.D.N.Y. 2011) (collecting cases).

Section 517.211 creates individual liability under the Florida Securities Act for sellers, directors, officers, partners, or agents if they have "personally participated or aided in making the

sale." Fla. Stat. § 517.211. This statute is "far more restrictive" than federal securities law." *E.F. Hutton & Co., Inc. v. Rousseff*, 537 So.2d 978, 981 (Fla. 1989). Thus, "parties liable under section 517.211 have to be directly involved in a sale of securities." *J.P. Morgan Securities, LLC v. Geveran Investments Ltd.*, 224 So.3d 316, 328 (Fla. Dist. Ct. App. 2017) (citing *Rousseff*, 537 So.2d at 981).

Here, as an initial matter Plaintiffs did not plead the section creating liability under the statute. Second, even if they had done so, the statute does not create liability for Sichenzia as it only drafted the Offering Memorandum; it was not directly involved in selling the securities.

### C. Pennsylvania Securities Act

The Pennsylvania Securities Act makes it unlawful to, "in connection with the offer, sale, or purchase of any security, "employ any device, scheme or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 70 Penn. Stat. § 1-401(a), (c). The elements of this cause of action are "(1) that defendant made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4) upon which plaintiffs relied; and (5) plaintiffs' reliance was the cause of their injury." *Gilliland v. Hergert*, No. 05-01059, 2007 WL 4105223, at *2 (W.D. Penn. Nov. 15, 2017) (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 871 (3d Cir. 2000)). Liability under section 401 is limited to "sellers" of securities. *Gilliland*, 2007 WL 4105223, at *2. Section 501 provides a cause of action for such violations. 70 Penn. Stat. § 1-501.

Additionally, Section 503 imposes liability on "every broker-dealer or agent who materially aids in the act or transaction constituting the violation," unless the individual "proves that he did not know, and in the exercise of reasonable care could not have known, of the

existence of the facts by reason of which the liability is alleged to exist." 70 Penn. Stat. § 1-503. It is unclear whether Section 503 creates its own cause of action, and Pennsylvania courts have ruled both ways on this issue. *See, e.g., Jairett v. First Montauk Securities Corp.*, 153 F. Supp. 2d 562, 577-78 (E.D. Penn. 2001) (collecting cases and allowing private cause of action under section 503); *Schor v. Hope*, No. 91-0443, 1992 WL 22189, at *3-4 (E.D. Penn. Feb. 4, 1992) (collecting cases and declining to imply a cause of action under section 503).

Plaintiffs only pleaded a violation of Section 401. *See* FAC ¶ 109. As an initial matter, Plaintiffs need to plead a claim under Section 501, which creates a cause of action. Regardless, because Plaintiffs do not allege that Sichenzia sold securities, Sichenzia cannot be held primarily liable.

Moreover, Plaintiffs did not raise Section 503 in any of their four amended complaints. They only cite Section 503 in their supplemental opposition brief. *See* Pl Supp Mem at 12. Courts have discretion to consider a previously unraised claim so long as it is supported by the factual allegations in the complaint and consideration will not prejudice defendants. *See In Re Dobrayel*, 287 B.R. 3, 19 (S.D.N.Y. 2002) (collecting cases). However, here the Court will not consider a claim under Section 503. Plaintiffs did not plead a cause of action under this section despite having four chances to amend their complaint; Pennsylvania courts are split as to whether Section 503 even creates its own cause of action; and Defendants may suffer prejudice due to lack of notice.

### D. North Carolina Securities Act

The North Carolina Securities Act prohibits any person from, in connection with the offer, sale, or purchase of any security, employing "any device, scheme, or artifice to defraud" and engaging "in any act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person." N.C. Gen. Stat. § 78A-8(1), (3). Section 78A-56 creates a

cause of action for individuals who "offer[] or sell[] a security." N.C. Gen. Stat. § 78A-56(a).

That section also creates secondary liability against any person who "materially aids in the

transaction giving rise to liability" if that person "actually knew of the existence of the facts by

reason of which the liability is alleged to exist." *Id.* at (c)(2). Claims under Section (c)(2)

require a showing of actual knowledge. *Tillery Environmental LLC v. A & D Holdings, Inc.*, No.

17-6525, 2018 WL 802515, at *22 (N.C. Sup. Ct. Feb. 9, 2018).

Here, Plaintiffs did not plead a claim under section 78A-56, which creates liability. Even

if they had, Sichenzia did not sell securities and thus cannot be held liable for primary violations

under section 78A-8. The FAC further did not plead vicarious liability under section 78A-

56(c)(2). In any event, as discussed above Plaintiffs have not pleaded facts sufficient to show

actual knowledge of the fraudulent scheme.

### E. North Dakota Securities Act

The North Dakota Securities Act prohibits any person from, in connection with the offer,

sale, or purchase of any security, employing "any device, scheme, or artifice to defraud;" making

"any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order

to make the statements made, in light of the circumstances under which they are made, not

misleading"; or engaging "in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person." N.D. Cent. Code § 10-04-15(2). An attorney

may be liable under the Act "if he is an agent representing the broker-dealer" and he

"participates or aids in any way the sale or contract for sale." *Ward v. Bullis*, 748 N.W.2d 397,

405 (N.D. 2008). However, "[t]o be liable as an agent [within the statute], the attorney must do

more than act as legal counsel, the attorney must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale." *Id.*

Here, Plaintiffs contend that Sichenzia did more than act as an attorney since it assumed roles as escrow agent, collateral agent, closing agent, and custodian of the instruments. Nevertheless, Plaintiffs do not allege that Sichenzia actively participated in selling the securities, as required to trigger liability. *See id.*

### F. Maryland Securities Act

The Maryland Securities Act prohibits any person from, in connection with the offer, sale, or purchase of any security, employing "any device, scheme, or artifice to defraud" and engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Md. Code § 11-301(1), (3). The cause of action arises under Md. Code § 11-703. Section (a)(1) imposes liability on people who offer or sell securities. Md. Code § 11-703(a)(1). Additionally, every "broker-dealer or agent who materially aids" in the unlawful conduct can be liable unless they are "able to sustain the burden of proof that [they] did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* at (c)(1).

An attorney "may be liable under the statute, but he must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale." *Baker, Watts & Co. v. Miles & Stockbridge*, 95 Md. App. 145, 167 (Md. Ct. Special App. 1992). Merely "draft[ing] documents for use in the purchase or sale of securities" is insufficient. *Id.*

Again, the FAC fails to plead the statutory section providing a cause of action and the section providing for indirect liability. Nevertheless, as discussed above Plaintiffs do not

plausibly allege that Sichenzia conducted any of the activities that would trigger attorney liability.

Accordingly, Plaintiffs' state securities law claims are dismissed.

## III. Breach of Escrow Agreement

New York courts have repeatedly determined that "[a]n escrow agreement is a contract," and accordingly "plaintiffs cannot impose upon [escrow agents] any obligations in addition to its limited duties under the express terms of its contract." *H & H Acquisition Corp., v. Financial Intranet Holdings*, 669 F. Supp. 2d 351, 363 (S.D.N.Y. 2009) (citations omitted).[5] Thus, Sichenzia may only be held liable for breach of the escrow agreement if Plaintiffs allege facts sufficient to show it violated the express terms of its contract.

Plaintiffs allege that Sichenzia breached the Escrow Agreement by releasing funds without "satisfactory instructions from RIM and 'the placement agent.'" FAC ¶ 152. Specifically, Sichenzia knew that (1) the closing of the property was scheduled for May 13, 2013 and (2) Commonwealth Title was the closing agent who was to receive the funds. *Id.* ¶ 153. Despite such knowledge, Sichenzia released $901,570 to the RIM Investment Group—which was not a party to the escrow agreement—on May 8, 2013—before the scheduled closing of the Property.

Plaintiffs' argument fails. The Escrow Agreement provides that Sichenzia was "obligated only for the performance of such duties as are specifically set forth [in the Agreement]." Escrow Agreement, Art. 2.8. As this Court determined in its November 22, 2016 decision, "Sichenzia's only duty with respect to releasing the funds from escrow was to ensure

---

[5] The escrow agreement giving rise to the relationship between Plaintiffs and Sichenzia includes a choice of law provision selecting New York as the governing law and both Plaintiffs and Sichenzia cite to New York law with respect to Plaintiffs' common law claims. *See* Escrow Agreement, art. 2.6. Accordingly, the Court will apply New York law to Plaintiffs' common law claims.

that the 'written instructions' from RIM and John Carris were 'in a form and substance satisfactory to [Sichenzia].'" MTD Opinion at 25. Moreover, as this Court held, "There is nothing in the escrow agreement that requires Sichenzia to deliver the escrowed funds to a particular account or account holder." *Id.* at 26.

Plaintiffs do not allege facts sufficient to show that Sichenzia violated this obligation. On May 8, 2013, Sichenzia received instructions to distribute funds "[i]n connection with the sale of . . . 10% Secured Promissory Notes of RIM San Antonio Acquisition, LLC pursuant to the . . . Escrow Agreement." May 8, 2013 Funds Memorandum (ECF No. 95-4.) Sichenzia distributed funds pursuant to those instructions. Plaintiffs have provided no allegations sufficient to determine that these instructions were not "in a form and substance satisfactory."

Therefore, the breach of escrow claim is dismissed.

## IV.  Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty in New York, a plaintiff must allege "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (collecting cases).

Plaintiffs allege that Sichenzia's fiduciary duties arose from "the role as escrow agent in connection with the RIM offering." FAC ¶ 156. There is no dispute that "[u]nder New York law, an escrow agreement creates a fiduciary relationship between the escrow agent and the parties to the escrow transaction." *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 728 (S.D.N.Y. 2014) (collecting cases). The issue is the extent of that duty.

Plaintiffs allege that Sichenzia violated its fiduciary duty as escrow agent by (1) releasing escrow funds without ensuring that it received satisfactory instructions under the Escrow

20

Agreement and (2) paying its legal fees for services provided to Carris out of the escrow funds, which was not disclosed in the Offering Memorandum. *See* FAC ¶¶ 158-59.

### A. Release of Funds

Here, Plaintiffs have not alleged a breach of fiduciary duty. "Given that the fiduciary duties of an escrow agent are born of a contractual relationship, if an escrow agent has 'acted in accordance with its obligations under the escrow agreement, it has not breached its fiduciary duty.' *Ray Legal Consulting Grp.*, 37 F. Supp. 3d at 729 (collecting cases); *see also Qube Films Ltd v. Padell*, No. 13-8405, 2016 WL 881128, at *4 (S.D.N.Y. Mar. 1, 2016) ("The scope of an Escrow Agent's fiduciary duty is defined by the scope of its contractual duty under the Escrow Agreement."). As discussed above, and as previously determined in this Court's November 22, 2016 opinion, Plaintiffs do not plausibly allege that Sichenzia breached the Escrow Agreement. Accordingly, Plaintiffs' claims for breach of fiduciary duty based on failure to comply with instructions in the escrow agreement must also fail. *See Qube Films Ltd*, 2016 WL 881128, at *4-5 (dismissing fiduciary claim where escrow agreement explicitly rejected any responsibility by escrow agent to confirm that conditions precedent had been met); *Carruthers v. Flaum*, 450 F. Supp. 2d 288, 317 (S.D.N.Y. 2006) (dismissing fiduciary claim where no evidence of instruction as to how escrow agent would use money).

Moreover, Plaintiffs have not sufficiently alleged that Sichenzia violated any independent fiduciary duty in tort. A "duty to act with care and loyalty independent of the terms of the contract" can "emerge from a relationship of trust and confidence created by a contract, as in the case of a lawyer and client." *Bullmore v. Banc of America Securities LLC*, 485 F. Supp. 2d 464, 470 (S.D.N.Y. 2007) (holding investor had independent duty of care to its clients). The New York Court of Appeals has clarified that "[p]rofessionals, common carriers and bailees for

example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (N.Y. 1992) (collecting cases). However, "where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Id.* (collecting cases). In "disentangling tort and contract claims," courts consider "the nature of the injury, the manner in which the injury occurred, and the resulting harm." *Id.* (collecting cases).

Plaintiffs allege that, in addition to serving as escrow agent, Sichenzia assumed duties of care as a collateral agent and closing agent. *See* Pl Supp Mem at 14; FAC ¶ 73; UCC Financing Statement (ECF No. 149-15). First, as Defendant notes, the FAC does not allege that Sichenzia served as the closing agent. *See* Def Supp Reply at 15. Second, Defendant contests that Sichenzia served as collateral agent, noting that the UCC Financing Statement is not signed by Plaintiffs. *See id.* As discussed *supra*, whether Sichenzia served as collateral agent is a question of fact that cannot be resolved at the motion to dismiss stage. Accordingly, the Court will assume *arguendo* that Sichenzia served as collateral agent.

Regardless, Plaintiffs do not plausibly allege that Sichenzia owed a duty beyond its contractual obligations. Plaintiffs do not allege that Sichenzia ever spoke with or otherwise interacted with the Plaintiffs, let alone occupied a position of "trust or special confidence" with them. *See, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Serv's, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (defendant owed no fiduciary duty to plaintiff "distinct from [his] obligation to perform under the [] agreement" because he "did not occupy a position of trust or special confidence with regard to [plaintiff] that imposed obligations beyond the express agreements" and "[h]e had little discretion to exercise, his obligations under the contract being straightforward and fixed."); *OSFI Fund II, LLC v. Canadian Imperial Bank of Commerce*, 82 A.D.3d 537, 539

(N.Y. 1st Dep't 2011) (absent the agreement, defendant "would have had no duty to plaintiffs . . . [the agreement] explicitly limits the duties of the administrative agent and collateral agent") (internal citations omitted). Moreover, Plaintiffs are essentially seeking to enforce their contractual bargain; they are not alleging any independent injury in tort. *See Sommer*, 79 N.Y.2d at 552.

### B. Payment of Legal Fees

Second, Plaintiffs allege that Sichenzia breached its fiduciary duty by paying itself out of the escrow funds without disclosure to Plaintiffs in the Offering Memorandum. However, nothing in the Offering Memorandum indicates that Sichenzia owed a fiduciary duty to disclose its payment. Moreover, as Defendant notes Sichenzia paid itself in response to written instructions from Carris and the RIM Defendants. *See* May 8, 2013 Funds Memorandum (ECF No. 95-4).

Accordingly, the breach of fiduciary duty claim is dismissed.

## V. Aiding and Abetting Fraud

To state a claim for aiding and abetting fraud in New York, a plaintiff must allege "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (citation and internal quotation marks omitted).

First, to show the existence of a fraud the plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (N.Y. 2009) (citations omitted).

Second, to satisfy the knowledge requirement the complaint must allege "actual knowledge of the fraud as discerned from the surrounding circumstances," not mere "constructive knowledge" based on what one should have known. *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (citing *Oster v. Kirschner*, 77 A.D.3d 51, 56 (N.Y. 1st Dep't 2010)).

Finally, substantial assistance "'occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" *SPV Osus Ltd. V. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (quoting *Lerner*, 459 F.3d at 295). Substantial assistance further "requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Id.* (quoting *Cromer Fin. Ltd. v. Berge*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)). That is, "the injury must 'be a direct or reasonably foreseeable result of the conduct.'" *Id.*

The heightened pleading standard of Rule 9(b) applies to aiding and abetting fraud claims and, as a result, a plaintiff must plead with particularity facts supporting each element of the claim. *Krys*, 749 F.3d at 129. Although knowledge, as compared to the other elements of an aiding and abetting fraud claim, "may be alleged generally" under Rule 9(b), "'generally' is merely 'a relative term' that allows knowledge to be pleaded with less particularity than is required for the pleading of fraud; 'generally' is not the equivalent of conclusorily." *Id.* (citations omitted). A plaintiff "must still plead the events which they claim give rise to an inference of knowledge." *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987) (citations omitted).

### i. Existence of a fraud

Plaintiffs and the RIM Defendants are currently litigating the underlying fraud claims. For the purposes of this motion, this Court will assume that a fraud existed.

### ii. Knowledge of the fraud

Plaintiffs claim that "Sichenzia knew or was willfully blind to the fact that the RIM Defendants sought to obtain the escrow funds in advance of the closing for the RIM Transaction and closing of the RIM Offering for purposes unrelated to the Property." FAC ¶ 161. Further, Sichenzia "knew the RIM Defendants intended to use the funds for purposes other than the RIM project when it received the instructions to send the escrow funds to a party other than Commonwealth Title which would constitute a fraud on the Plaintiffs." *Id.*

Such allegations are insufficient to show knowledge. Plaintiffs' conclusory assertion that Sichenzia knew or was willfully blind to the fraud is inadequate under the heightened pleading standard for fraud cases. *See Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 25 (N.Y. 1st Dep't 2015) (collecting cases). Moreover, Plaintiffs have not pleaded "the events which they claim give rise to an inference of knowledge." *See Krys*, 749 F.3d at 129. While Plaintiffs have alleged that Sichenzia drafted the Offering Memorandum, they have not adduced specific allegations that Sichenzia actually knew about the RIM Defendants' alleged fraud in connection with that Memorandum. Finally, as discussed *supra* and in this Court's November 2016 decision, Sichenzia's release of the escrow funds, alleged alteration of the Notes, delay in delivering the Notes, and withholding of the Security Agreements is insufficient to show actual knowledge of a scheme to defraud Plaintiffs.

Since Plaintiffs have not plausibly alleged that Sichenzia had knowledge of the alleged fraud, the aiding and abetting fraud claim is dismissed.

## VI. Negligence

In New York, to state a claim for negligence a plaintiff must allege: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that

breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citations omitted).

New York law generally enforces contract provisions that absolve a party from negligence, provided, however, a party cannot escape liability for "gross negligence." *See Colnaghi, U.S.A., Ltd. v. Jewelers Protection Serv's, Ltd.*, 81 N.Y.2d 821, 823 (N.Y. 1993). Gross negligence "is conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Id.* at 823-24 (quoting *Sommer*, 79 N.Y.2d at 554).

Plaintiffs allege that Sichenzia owed a duty as (1) "escrow agent" and (2) "drafter of the Offering Memorandum." FAC ¶ 167. Additionally, in their supplemental opposition brief, Plaintiffs argue that Sichenzia can be held liable under the "assumed duty" doctrine. Pl Supp Mem at 13.

## A. Negligence Based on Role as Escrow Agent

Plaintiffs claim that Sichenzia owed Plaintiffs a duties of "care, honesty and loyalty" and to "comply with the applicable standards of care for . . . escrow agents or others holding funds in an IOLA account." FAC ¶ 167. In addition to Sichenzia's alleged misconduct in releasing the escrow funds to an unrelated entity before the closing date, Plaintiffs allege that Sichenzia was grossly negligent with respect to Plaintiff Worthington by releasing its funds from escrow without having received a signed Subscription Agreement from him indicating an agreement to participate in the RIM Offering. *Id.* ¶ 168.

Here, Plaintiffs cannot state a negligence claim based on a duty stemming from Sichenzia's role as escrow agent. Under the terms of the Escrow Agreement, Sichenzia cannot be held liable "while acting in good faith and in the absence of gross negligence, fraud, and willful misconduct." Escrow Agreement, art. 2.8. Plaintiffs' allegations do not plausibly suggest

that any of Sichenzia's conduct constituted gross negligence, fraud, or willful misconduct. This Court ruled that nothing in the Escrow Agreement required Sichenzia to confirm that Subscription Agreements were signed before releasing funds from escrow. MTD Opinion at 25. Indeed, as elucidated in that opinion and as discussed *supra*, Plaintiffs have not plausibly alleged that Sichenzia violated any of its duties as escrow agent. Accordingly, Plaintiffs' negligence claims for this conduct must also fail. *See H & H Acquisition Corp. v. Fin. Intranet Holdings*, 669 F. Supp. 2d 351, 363-64 (S.D.N.Y. 2009) (simultaneously dismissing plaintiff's claims for breach of fiduciary duty and negligence because plaintiff was improperly attempting to "unilaterally enlarge [defendant's] duties under the contract and then claim that [defendant] was negligent in failing to take these duties on.").

### B. Negligence Based on Role as Drafter of Offering Memorandum

Plaintiffs allege that Sichenzia owed "duties of care, honesty, and loyalty" and "a duty to comply with the applicable standards of care for preparers of Offering Memorandums." FAC ¶ 167. In particular, "[t]he numerous false and misleading statements" and "omissions of material facts in the Offering Memorandum . . . were made knowingly or grossly negligently." *Id.*

Under New York law, "a third party, without privity, cannot maintain a claim against an attorney in professional negligence, 'absent fraud, collusion, malicious acts or other special circumstances.'" *Estate of Schneider v. Finmann*, 15 N.Y.3d 306, 308-09 (N.Y. 2010) (citation omitted); *accord Crossland Sav. FSB v. Rockwood Ins. Co.*, 692 F. Supp. 1510, 1514 (S.D.N.Y. 1988) ("New York courts have repeatedly reaffirmed the rule that an attorney may not be held liable in negligence by one with whom he is not in contractual privity." (collecting cases).

Here, first, Plaintiffs have not alleged privity. Sichenzia represented Carris, not Plaintiffs, in the RIM Offering. Plaintiffs' only contractual connection to Sichenzia is related to

the escrow agreement, and this Court has already ruled that Plaintiffs cannot state a claim for negligence with respect to that agreement.

Second, as this Court held *supra*, Plaintiffs have not stated a claim for fraud. Finally, Plaintiffs have not pleaded any other "special circumstances" entitling them to maintain a cause of action for negligence. *See, e.g., AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 5 N.Y.3d 582, 595 (N.Y. 2005) (dismissing negligence claim where no privity and complaint "does not set forth a claim for fraud or collusion or any of the other exceptions to the privity rule"); *Fredriksen v. Fredriksen*, 30 A.D.3d 370, 372 (N.Y. 2nd Dep't 2006) (no claim for negligence against attorney where parties were not in privity and complaint "fails to plead evidentiary facts showing" that Defendants "aided and abetted . . . the commission of fraud").

### C. Negligence Based on Assumed Duty

"Under New York law anyone who voluntarily assumes a duty can be held liable for negligence in the performance of that duty." *Morgan Stanley & Co. v. JP Morgan Chase Bank, N.A.*, 645 F. Supp. 2d 248, 256 (S.D.N.Y. 2009). "[T]he question is whether defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing." *Id.* (quoting *Heard v. City of N.Y.*, 82 N.Y.2d 66, 72 (N.Y. 1993)).

Plaintiffs allege that Sichenzia assumed a duty to act as Plaintiffs' escrow and collateral agent. Pl Supp Mem at 13. Defendant asserts that Plaintiffs have not alleged any facts capable of establishing that Sichenzia assumed duties to Plaintiffs at any time. Def Supp Reply at 14-15.

Here, Plaintiffs have not stated a claim under the assumed duty doctrine. Any violations with respect to Sichenzia's role as escrow agent are properly dismissed, as discussed *supra*. Moreover, Plaintiffs do not allege that, in Sichenzia's alleged role as collateral agent, it assumed duties beyond those in the contract. *See OSFI Fund II, LLC v. Canadian Imperial Bank of*

*Commerce*, 82 A.D.3d 537, 539 (N.Y. 1st Dep't 2011) (defendant "did not assume all the duties of an agent under New York law" since the agreement "explicitly limits [defendant's] duties"). Plaintiffs also do not allege facts showing that Sichenzia's actions put them in a "more vulnerable position" than they would have been had another entity operated as collateral agent. More fundamentally, as discussed *supra* Plaintiffs' claims "sound in contract rather than tort." *See id.*

Since Plaintiffs have not alleged that Sichenzia owed them any duty in tort, they cannot state a claim for negligence. *See Gray v. Wackenhut Serv's, Inc.*, 721 F. Supp. 2d 282, 287 (S.D.N.Y. 2010) (quoting *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 341 (N.Y. 1928)) ("Absent a duty of care, there can be no breach thereof and no liability.").

Accordingly, Sichenzia's motion to dismiss all claims against it is GRANTED. The Clerk of Court is respectfully requested to terminate the motion at ECF No. 94.

**SO ORDERED.**

Dated: March 26, 2018
    New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**